1

2

3

4

5

6                  IN THE UNITED STATES DISTRICT COURT

7

8                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

9    STEPHEN FRANSWAY,

10            Petitioner,                        No. C 06-06457 JSW

11       v.
                                                **ORDER DENYING PETITION**
12    ANTHONY P. KANE,                          **FOR WRIT OF HABEAS CORPUS**

13            Respondent.

14   _____/

15                          **INTRODUCTION**

16          Now before the Court is the petition for a writ of habeas corpus pursuant to 28 U.S.C.

17   § 2254 filed by Petitioner Stephen Fransway ("Fransway").  The petition is now ripe for

18   consideration on the merits, and, for the reasons set forth below, the Petition is DENIED.

19                          **BACKGROUND**

20   **A.    Procedural History.**

21          On July 20, 1978, Fransway pleaded guilty and was convicted of first degree murder with

22   use of a firearm and sentenced to state prison for life with a possibility of parole at 7 years.

23   (Petition "Pet." at 3.)  Fransway is currently in the custody of the California Department of

24   Corrections and Rehabilitation at Soledad State Prison in Soledad, California.  (Answer, Ex. E

25   (State Court Habeas Petition) at 3.)  Fransway does not contest his conviction or the resulting

26   sentence.  Rather, he seeks habeas relief based upon the denial of parole at his seventeenth

27   suitability hearing which was held on January 5, 2005 ("the Hearing").

28          At the Hearing, the Board of Prison Terms ("Board") found Fransway unsuitable for

**United States District Court**
For the Northern District of California

1   parole and deferred a further hearing for a period of one year.  (Answer, Ex. B (Transcript and
2   Decision of January 5, 2005 Hearing ("Tr.") at 75.)  On July 20, 2005 the Superior Court of
3   California for the County of Los Angeles denied Fransway's state habeas petition in a reasoned
4   opinion relying on the unsuitability factors determined by the Board.  (Answer, Ex. E at 1-3.)
5   On May 4, 2006 the Court of Appeal of California denied Fransway's petition stating that the
6   record reflected some evidence to support the challenged decision.  (Answer, Ex. F.)  On July
7   26, 2006, the California Supreme Court summarily denied Fransway's state habeas petition.
8   (Answer, Ex. G.)  Fransway timely filed his petition with this Court on October 16, 2006.

9           On October 24, 2006, the Court ordered Respondent to show cause.  Respondent filed an
10  Answer on March 19, 2007 in which Respondent contended that at the outset, there is no liberty
11  interest in parole, but even if there is, Fransway was afforded all the due process required under
12  the law.  Fransway filed a Corrected Traverse and Memorandum of Points and Authorities in its
13  support on April 13, 2007 addressing those issues.

14  **B.    Factual Background.**

15          The following facts are derived from the hearing transcript as found by the Board.
16  Although Fransway does not challenge his conviction, the facts underlying that conviction are
17  pertinent to the resolution of his habeas petition and are set forth as follows:

18              On December 14, 1977, El Monte Police Department responded to
19      5017 Peck Road in response to a shooting incident.  Upon entering the
        apartment, the officers observed the victim lying on the floor.  The officers
20      had a paramedic team transfer the victim to the South El Monte Community
        Hospital where he was pronounced dead on arrival.  The victim was
        identified as 42 year old Ronald Franklin Giles, or Giles, G-I-L-E-S.

21
22              The homicide division of the Los Angeles County Sheriff's
        Department conducted the investigation.  Officers were able to locate the
23      name and telephone number of the victim's secretary and contacted her.  She
        related that at about 8:45 p.m., on the date of the victim's death she had
24      talked with the victim.  The victim had informed her that he had just been
        talking to a Mr. Bill Wood, who was one of his former salesmen who had
25      moved to Denver, Colorado, and was in the process of setting up another
        magi-color, that's M-A-G-I hyphen C-O-L-O-R distributorship in the Denver
26      area.  The secretary gave the investigating officers the address and telephone
        number of Mr. Bill Wood and his brother, Jim Wood, who resided in the
        State of Colorado.

27
28              The officers were able to ascertain that the victim's business was that
        of selling film packages.   On December 17th, excuse me, December 16,
        1977

United States District Court

For the Northern District of California

1   sheriff's deputies contacted James Wood who related that he would stand to
2   lose 13,000 dollars due to the death of the deceased because it was he that
    had put up that amount of money in order to secure a partnership with the
3   deceased.  James Wood also related that his brother, Bill Wood, had made
    the comment to him a few days prior to the death of the deceased that he was
4   going to kill the victim.  Mr. Wood related that he owned a .22 caliber
    automatic but it had been missing for about two weeks and that he suspected
5   that his brother or his brother's friend, a Eugene Stors, S-T-O-R-S, had taken
    the weapon.  James Wood then stated that he felt that his brother and Mr.
6   Stors had also taken a Ford pickup truck.

7        Sheriff's deputies were later able to learn that Mr. Wood's Ford
    pickup truck was located in a parking lot of the Denver International Airport.
8   Deputies then contacted the Manifest Records Office of the Denver Airport
    and learned that a Eugene Stors flew on December 13, 1977, from Denver to
9   Los Angeles.  It was also learned that Eugene Stors flew to Denver on
    December 15, 1977.  Eugene Stors was then viewed as a possible suspect for
10  this homicide.

11       An investigation as to telephone numbers revealed that one telephone
    number belonged to Barbara Coyhis, C-O-Y-H-I-S.  Ms. Coyhis revealed that
12  she was currently separated from her husband and the she was using her
    maiden name while her married name was Fransway.  She identified a picture
13  showed to her by sheriff's deputies as being her husband with a name of
    Stephen Fransway and not Eugene Allen Stors.  An all points bulletin was
14  then issued for Stephen James Fransway aka Eugene Allen Stors.

15       On January 25th, 1978, the prisoner was arrested by Fullerton Police
    Department.  In the interview, the prisoner related that he had gone to the
16  deceased's apartment in order to discuss a business matter and then an
    argument ensued.  The prisoner related that he had carried a pistol in a
17  briefcase and when the argument became very heated, he proceeded to open
    up the briefcase and then fired one shot at the victim.  After being hit with the
18  one shot, the victim supposedly lunged forward towards the prisoner and
    thereupon he fired a second shot and prior to the victim falling, he grabbed
19  for the gun and thereupon knocking the silencer off the gun.

20  (Pet. Ex. B (Tr. at 12:26-16:21).)

21       The Board also quoted the prisoner's version from the probation report prepared for

    Fransway's February, 1999 hearing as follows:

22       Fransway states, I set out to kill Mr. Giles.  The argument just made
23  it easier.  I was cold and wanted to be cold.  I wanted to show the group that
    I was around, that I was what I professed to be, a hit man.  The killing was
24  about nothing.   I was completely out of control emotionally; however, I
    knew what I was doing.  It carried me into my prison life and even into my
25  marriage.  It carried into, rather, my prison life and even into my marriage.
     It was all for an image I wanted to portray.  There was a part of me that was
26  telling me not to do it and to back out, and as soon as it happened, I panicked.
    It was good for me that I didn't get away with this and that I was caught,
27  because I feel that it could have happened again if I had not been caught.  I
    had a tough-guy shell over me, but in Court the victim's family was present
28  and the severity of what I did finally hit me.

1    ( Pet. Ex. B at 17:16-18:14.)

2          Fransway was arrested and pleaded guilty to first degree murder on July 20, 1978.  (Pet.

3    at 3.)  Fransway was sentenced to state prison for life with a possibility of parole at 7 years (with

4    142 days of jail credit, his minimum eligible parole date was March 1, 1985).  *Id.*

5          After Fransway became eligible for parole, the Board found him unsuitable for a parole

6    release date on seventeen occasions.  At his seventeenth hearing, at issue here, the Board found

7    him unsuitable for parole because they determined that he would pose an unreasonable danger to

8    society or a threat to public safety if released from prison.  Their conclusion was based on the

9    following factors: (1) he had no solid parole plans in Los Angeles County; (2) the commitment

10   offense was an execution-style murder carried out in a cruel fashion which demonstrated a lack

11   of regard for the life and suffering of another; (3) Fransway needed to continue participating in

12   self-help; (4) Fransway had a lengthy criminal history; and (5) Fransway had three disciplinary

13   infractions while in prison.  (Pet. Ex. B at 70:17-73:22.)  The fact that Fransway did not have any

14   plans for release in Los Angeles County predominating as the most significant reason for the

15   denial.  (*See id.* at 70:17-71:7.)

16         The Board did commend Fransway for his positive behavior while incarcerated: "this

17   decision was a tough one, because our responsibility is to determine if you are a threat to society,

18   and you honestly haven't helped us very much here today."  (*Id.* at 70:14-17.)  In addition, the

19   Board commended Fransway because:

20        First of all, the fact that you've been disciplinary-free for 23 years, the fact
          that you have, you continued once you came in the institution to upgrade

21        educationally by completing your AA or your completion of a small business
          operation program, by your upgrading vocationally, having completed

22        mechanical drawing, the CAD program, by participating in self-help
          programs, most recently Share a Bear, Operation Courage, and previously

23        NA, AA, Breaking Barriers as a facilitator, Men's Violence Prevention,
          Laubach Tutor, completion of the sexually transmitted disease courses and

24        participation in true self-help through the reading of various books.  Also,
          your work ethic is extraordinary by all accounts, with laudatory chronos,

25        exceptional work reports as a clerk and as previously in landscape,
          micrographics, art assistant, as a barber, and specifically, in what seems to

26        be a long running job as far back as the late '70s, serving as a draftsman in
          plant operations and as a lead man and teacher's aid in vocational drafting,

27        the most recent, of course, as a clerk in culinary and Captain's clerk,
          currently as a porter.

28

**United States District Court**
For the Northern District of California

4

United States District Court

For the Northern District of California

1  (*See id.* at 73:24-74:21.)

2      As mentioned earlier, the Board viewed Fransway's lack of post-release plans in Los

3  Angeles County as a significant factor weighing against a grant of a release date.  (*Id.* at 70:17-

4  71:7.)  The Board determined that Fransway had not put sufficient effort into securing a post-

5  release residence in Los Angeles.  (*Id.* at 70:24-26.)  According to the Board, Fransway's lack of

6  a place to live in Los Angeles was "a huge hang-up."  (*Id.* at 71:2-3.)

7      The Board further determined that the commitment offense was "a vicious crime carried

8  out on an unsuspecting victim who was shot to death in what appears to have been his place of

9  business," and that "this was essentially an execution-style murder." (*Id.* at 71:15-22.)  The

10  Board found that due to the gravity of the offense and because it showed lack of regard for

11  human life and suffering, in addition to the fact that he demonstrated no realistic post-release

12  plans in Los Angeles County, Fransway was not ready to be released.

13      The Board also considered a psychiatric report prepared by the prison psychologist, Dr.

14  Melvin Macomber, on December 2, 2003.  The Board noted that the report supported release and

15  quoted the report during the hearing.  (*Id.* at 72:15-17; 46:22-52:11.)  According to Dr.

16  Macomber's report, Fransway had no history of emotional problems and his insight and self

17  awareness was very good.  (*Id.* at 46:22-27.)  The report also stated that Fransway posed a low

18  potential for violence in the community and "in fact, it's probably lower than the average citizen

19  in the community due to his life experiences and prison term."  (*Id.* at 47:6-12.)  Dr. Macomber

20  also found that Fransway's "ability to refrain from the use of drugs and alcohol, or alcohol in the

21  future is excellent." (*Id.* at 47:21-24.)  In addition, Dr. Macomber's report stated that Fransway

22  had made significant gains in his maturity and growth over the years, and that there was no

23  evidence of any antisocial thinking or values.  (*Id.* at 49:6-11.)  Despite this report, the Board

24  recommended that Fransway continue to participate in self-help in order to "develop the skills

25  that will allow him to deal with the stress of not only the institution but the stresses he's going to

26  encounter in the outside in [*sic*] a nondestructive manner."  (*Id*. at 73:16-20.)  The Board found

27  that "until further progress is made in these areas, he continues to be unpredictable and a

28  potential threat to others."  (*Id*. at 73:20-22.)

United States District Court

For the Northern District of California

1    The Board also considered the fact that Fransway had a history of criminal conduct that

2    involved convictions for auto-theft and forgery.  (*Id.* at 72:21-73:3.)  Finally, the Board found

3    that Fransway continued to display negative behavior because he had three disciplinary

4    infractions in the first three years of his incarceration.  (*Id.* at 73:6-9.)

5        The Board concluded that the favorable factors did "not outweigh the factors of

6    unsuitability."  (*Id.* at 74:21-23.)  The Board deferred Fransway's next parole hearing for one

7    year and recommended that Fransway remain disciplinary free, continue to participate in self-

8    help, and "once again that [he] work on getting a place to live in Los Angeles County."  (*Id.* at

9    74:24-75:2.)

10                                   **ANALYSIS**

11        Fransway raises three claims in his Petition.  First, he alleges that the Board violated the

12   Constitution's prohibition against *ex post facto* laws by using post-1978 parole suitability

13   guidelines to determine whether he should be released.  Second, Fransway argues that the Board

14   violated his due process rights because it did not have sufficient evidence to find him unsuitable

15   for parole.  Finally, Fransway alleges that the Board's process for determining parole suitability

16   is unconstitutional because it is not subject to meaningful judicial review and the Board follows

17   an unlawful policy of denying parole for nearly all first-degree murderers.

18   **A.    Standard of Review.**

19        This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in

20   custody pursuant to the judgment of a state court only on the ground that he is in custody in

21   violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); *see*

22   *also Rose v. Hodges*, 423 U.S. 19, 21 (1971).  The Ninth Circuit has applied § 2254(d) to review

23   of parole suitability decisions.  *See Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007); *Rosas v.*

24   *Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005) (per curiam); *McQuillion v. Duncan*, 306 F.3d 895,

25   901 (9th Cir. 2002).  Because the petition in this case was filed after the effective date of the

26   Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), AEDPA's provisions apply.

27   *Jeffries v. Wood*, 103 F.3d 827 (9th Cir. 1996) (en banc).

28

United States District Court

For the Northern District of California

1    Under AEDPA, this Court may grant the petition with respect to any claim that was

2    adjudicated on the merits in state court only if the state court's adjudication of the claim: "(1)

3    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

4    established Federal law, as determined by the Supreme Court of the United States; or (2) resulted

5    in a decision that was based on an unreasonable determination of the facts in light of the

6    evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *see also Williams v.*

7    *Taylor*, 529 U.S. 362, 413 (2000) (hereinafter "*Williams*").  Courts are not required to address

8    the merits of a particular claim but may simply deny a habeas application on the ground that

9    relief is precluded by 28 U.S.C. § 2254(d).  *Lockyer v. Andrade*, 538 U.S. 63, 70-73 (2003).  It is

10   the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d).

11   *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).

12       "Clearly established federal law, as determined by the Supreme Court of the United

13   States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of

14   the time of the relevant state-court decision."  *Williams*, 529 U.S. at 412; *Barker v. Fleming*, 423

15   F.3d 1085, 1093 (9th Cir. 2005) ("clearly established" federal law determined as of the time of

16   the state court's last reasoned decision); *Alvarado v. Hill*, 252 F.3d 1066, 1068-69 (9th Cir.

17   2001).  "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme]

18   Court's jurisprudence."  *Williams*, 529 U.S. at 412.  The Supreme Court has explained

19   repeatedly that AEDPA, which embodies deep-seated principles of comity, finality, and

20   federalism, establishes a highly deferential standard for reviewing state-court determinations.

21   *See id.* at 436.  Thus, "[a] federal court may not overrule a state court for simply holding a view

22   different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous."

23   *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

24       Under the "contrary to" clause of section 2254(d)(1), a federal court may grant the writ

25   only if the state court "applies a rule that contradicts the governing law set forth in [Supreme

26   Court] cases, 'or if it confronts a set of facts that are materially indistinguishable from a

27   decision' of the Supreme Court and nevertheless arrives at a different result."  *Early v. Packer*,

28   537 U.S. 3, 8 (2002) (quoting *Williams*, 529 U.S. at 405-06).  Under the "unreasonable

**United States District Court**
For the Northern District of California

1   application" clause of section 2254(d)(1), a federal court may grant the writ if the state court

2   identifies the correct governing legal principle from the Supreme Court's decisions but

3   unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413.

4        A federal habeas court "may not issue the writ simply because that court concludes in its

5   independent judgment that the relevant state-court decision applied clearly established federal

6   law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 412.

7   The objectively unreasonable standard is not a clear error standard. *Lockyer*, 538 U.S. at 75-76;

8   *Clark v. Murphy*, 331 F.3d 1062, 1067-69 (9th Cir.), *cert. denied*, 540 U.S. 968 (2003). After

9   *Lockyer*, "[t]he writ may not issue simply because, in our determination, a state court's

10  application of federal law was erroneous, clearly or otherwise. While the 'objectively

11  unreasonable' standard is not self-explanatory, at a minimum it denotes a greater degree of

12  deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them." *Clark*, 331

13  F.3d at 1068.

14       In determining whether the state court's decision is contrary to, or an unreasonable

15  application of, clearly established federal law, a federal court looks to the decision of the highest

16  state court to address the merits of a petitioner's claim in a reasoned decision. *LaJoie v.*

17  *Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). If the highest state court has summarily denied

18  a petitioner's claim, the habeas court may "look through" that decision to the last state court

19  addressing the claim in a reasoned decision. *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2

20  (9th Cir. 2000) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

21       In this case, the California Court of Appeal denied Fransway's petition in a reasoned

22  decision. (Pet. Ex. F.) The Supreme Court of California then summarily denied Fransway's

23  state petition. (Pet. Ex. G.) Accordingly, this Court will "look through" the California Supreme

24  Court's decision to the California Court of Appeal's decision in deciding whether the state

25  court's decision is contrary to, or an unreasonable application of, clearly established federal law.

26  **B.**     **Legal Standards Applicable to Parole Suitability Determinations.**

27       California's parole scheme is set forth in California Penal Code § 3041, *et seq.* Section

28  3041(a) provides, in pertinent part:

**United States District Court**
For the Northern District of California

> In the case of any inmate sentenced pursuant to any provision of law... [o]ne year prior to the inmate's minimum eligible parole release date a panel of two or more commissioners or deputy commissioners shall again meet with the inmate and shall normally set a parole release date as provided in Section 3041.5. ... The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates.

Cal. Penal Code § 3041(a).

Penal Code section 3041(b) provides, in pertinent part:

> The panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

Cal. Penal Code § 3041(b).

Title 15 of the California Code of Regulations section 2402 (hereinafter "Section 2402") sets forth the criteria used to determine whether an inmate is suitable for release on parole. The opening paragraph of Section 2402(a) states:

> Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

15 Cal. Code Regs. § 2402(a).

Section 2402(b) provides:

> All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any considerations of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

*Id.* § 2402(b).

Circumstances tending to show unsuitability for parole are:

> (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

9

        (A) Multiple victims were attacked, injured or killed in the same or separate incidents.

        (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

        (C) The victim was abused, defiled or mutilated during or after the offense.

        (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

        (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence.  The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History.  The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses.  The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors.  The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

*Id.* § 2402(c).

Circumstances supporting a finding of suitability for parole are:

(1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands that nature and magnitude of the offense.

(4) Motivation for Crime.  The prisoner committed his crime as a result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was a result of that victimization.

United States District Court

For the Northern District of California

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the possibility of recidivism.

(8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

*Id.* § 2402(d).

The regulations also contain a matrix of suggested base terms depending on the murder degree and the circumstances surrounding the murder.  The matrix provides three choices of suggested base terms for several categories of crimes.  *See id.* § 2403.  For second degree murders, the matrix of base terms ranges from the low of 15, 16, or 17 years, to a high of 19, 20 or 21 years, depending on some of the facts of the crime.[1]

Although the matrix is to be used to establish a base term, an inmate's base term is set only when he or she has been found suitable for parole.  *In re Dannenberg*, 34 Cal. 4th 1061, 1087 (2005).  Thus, the statutory scheme places individual suitability for parole above a prisoner's expectancy in an early setting of a fixed date designed to ensure term uniformity.  *Id.* at 1070-71.

> While subdivision (a) of section 3041 states that indeterminate life (i.e., life-maximum) sentences should "normally" receive "uniform" parole dates for similar crimes, subdivision (b) provides that this policy applies "*unless* [the Board] determines" that a release date cannot presently be set because the particular offender's crime and/or criminal history raises "*public safety*" concerns requiring further indefinite incarceration. (Italics added.) Nothing in the statute states or suggests that the Board must evaluate the case under standards of term uniformity before exercising its authority to deny a parole date on the grounds the particular offender's criminality presents a *continuing public danger.*

*Id.* at 1070 (emphasis, brackets, and parentheses as in original).  In sum, "the Board, exercising its traditional broad discretion, may protect public safety in each discrete case by considering the

---

[1]      One axis of the matrix concerns the relationship between murderer and victim and the other axis of the matrix concerns the circumstances of the murder.  The choices on the axis for the relationship of murderer and victim are "participating victim," "prior relationship," and "no prior relationship."  The choices on the axis for the circumstances of the murder are "indirect," "direct or victim contribution," and "severe trauma."  Each of the choices are further defined in the matrix.  *See* 15 Cal. Code Regs. § 2403(c).

11

United States District Court

For the Northern District of California

1    dangerous implications of a life-maximum prisoner's crime individually." *Id.* at 1071. The

2    California Supreme Court's determination of state law is binding in this federal habeas action. *See*

3    *Hicks v. Feiock*, 485 U.S. 624, 629 (1988); *Sandstrom v. Montana*, 442 U.S. 510, 516-17 (1979).

4         The California Supreme Court also has determined that the facts of the crime alone can

5    support a sentence longer than the statutory minimum, even if everything else about the prisoner is

6    laudable. "While the board must point to factors beyond the minimum elements of the crime for

7    which the inmate was committed, it need engage in no further comparative analysis before

8    concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the

9    prisoner's release." *Dannenberg*, 34 Cal. 4th at 1071; *see also In re Rosenkrantz*, 29 Cal. 4th 616,

10   682-83 (2002) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for

11   denying parole" but might violate due process "where no circumstances of the offense reasonably

12   could be considered more aggravated or violent than the minimum necessary to sustain a

13   conviction for that offense").

14   **C.    The Board's Reliance on Post-1978 Guidelines Did Not Violate  *Ex Post Facto*
            Constitutional Principles.**

15        Petitioner first alleges that the Board's application of post 1978 parole suitability

16   guidelines to his case violates Constitutional prohibitions against *ex post facto* laws because he

17   was convicted before the regulations were amended. Article I, Section 10 of the United States

18   Constitution forbids the States from passing any *"Ex Post Facto* Law." The Supreme Court has

19   held that the *Ex Post Facto* Clause is aimed at laws that "retroactively alter the definition of crimes

20   or increase the punishment for criminal acts." *Collins v. Youngblood*, 497 U.S. 37, 41 (1990). The

21   Supreme Court has not ruled directly on whether California's amended parole suitability

22   guidelines are more or less onerous than their predecessors. However, the Supreme Court has

23   considered whether retroactive application of a California statute, which amended parole

24   procedures to allow the Board to decrease the frequency of parole, violated the *Ex Post Facto*

25   Clause. *California Dept. of Corrections v. Morales*, 514 U.S. 499 (1995).

26        In *Morales*, the Supreme Court held that the controlling inquiry was "whether retroactive

27   application of the change in California law created a sufficient risk of increasing the measure of

28

United States District Court

For the Northern District of California

1    punishment attached to the covered crimes." *Morales,* 514 U.S. at 509.  The Supreme Court found

2    that the amendment did not increase the punishment attached to the respondent's crime, but

3    "simply 'alters the method to be followed' in fixing a parole release date under identical

4    substantive standards." *Id.* at 508 (quoting *Miller v. Florida*, 482 U.S. 423, 433 (1987)).

5    Furthermore, in addressing a similar issue, the Ninth Circuit has held that a prisoner is not

6    disadvantaged when his suitability is considered under the amended guidelines because "the DSL

7    [determinate sentencing laws] guidelines require consideration of the same criteria as did the ISL

8    [indeterminate sentencing laws]." *Connor v. Estelle,* 981 F.2d 1032 (9th Cir. 1992).

9            The California Court of Appeal did not address Fransway's *Ex Post Facto* claim.

10   However, there is no evidence showing that the new regulations in any way increased his

11   punishment.  Consequently, Fransway's *ex post facto* challenge is without merit and, to the extent

12   Fransway seeks relief on this basis, his Petition is DENIED.

13   **D.     The Board's Decision to Deny Fransway Parole Did Not Violate His Due Process**
             **Rights.**

14

15           **1.      Legal Standards.**

16           Fransway asserts that the Board's decision to deny him parole at the May, 2005 hearing

17   violated his due process rights.  "In analyzing the procedural safeguards owed to an inmate under

18   the Due Process clause, [a court] must look to two distinct elements: (1) a deprivation of a

19   constitutionally protected liberty or property interest, and (2) a denial of adequate procedural

20   safeguards." *Biggs v. Terhune*, 334 F.3d 910, 913 (9th Cir. 2003).  The second prong of this test is

21   satisfied if: (1) the inmate has been afforded an opportunity to be heard and, if denied parole,

22   informed of the reasons underlying the decision; and (2) the Board's decision is supported "some

23   evidence" or is not otherwise arbitrary. *Hayward v. Marshall*, 512 F.3d 536, 542 (9th Cir. 2008)

24   (citing *Irons,* 505 F.3d at 851 and *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128-29 (9th

     Cir. 2006)); *Jancsek v. Oregon Bd. of Parole*, 833 F.2d 1389, 1390 (9th Cir. 1987).

25

26           Fransway does not argue that he was denied an opportunity to be heard or that the Board

27   failed to inform him of its reasons for the decision.  Rather, he contends the Board's conclusion

28   that he would pose an unreasonable risk of danger to society if released was both arbitrary and not

13

United States District Court

For the Northern District of California

supported by "some evidence."  Respondent argues that the "some evidence" standard is not applicable in federal habeas proceedings.  That argument, however, is foreclosed by Ninth Circuit authority.  *See Sass*, 461 F.3d at 1129.  Respondent further argues that in any event, the Board's decision that Fransway posed an unreasonable danger to society was indeed supported by some evidence.

"To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  Instead, the relevant question is whether there is any evidence in the record that could support the conclusion' reached by the parole board."  *Sass*, 461 F.3d at 1128 (quoting *Superintendent v. Hill*, 472 U.S., 445, 455-56 (1985)).  "*Hill*'s some evidence standard is minimal and assures that 'the record is not so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary.'"  *Id.* at 1129 (quoting *Hill*, 472 U.S. at 457).  Further, in order to determine whether the Board's decision to find Fransway unsuitable for parole is supported by some evidence, this Court must focus not on whether some evidence "that a particular factor or factors indicating unsuitability exist," but on whether there is some evidence to conclude that "a prisoner's release will unreasonably danger public safety."  *Hayward*, 512 F.3d at 543 (citations omitted).

**2.      Analysis.**

Fransway contends that the Board's decision to find him unsuitable for parole is not supported by some evidence.  As set forth above, at the hearing, the Board found Fransway unsuitable for parole and an unreasonable risk or danger to others if released based on the following five factors: (1) Fransway had no realistic post-release plans in Los Angeles County; (2) the nature of his commitment offense; (3) Fransway needed to continue with self-help programming; (4) Fransway had a lengthy criminal history; and (5) Fransway had three disciplinary infractions while in prison.

**a.      Fransway's Lack of Post-Release Plans.**

The first, and what seems to be the most predominant, factor that the Board relied on in denying Fransway parole, was the fact that he did not have post-release residence plans in Los

14

United States District Court

For the Northern District of California

1   Angeles County.  "That's one of the reasons why your decision was overturned in '96, why it was

2   not approved in '96 is because you didn't have a place in California to live.  So that's one reason

3   for our denial today." (Pet. Ex. B at 71:4-7.)  The prisoner's parole plans may be considered by

4   the Board.  Among the circumstances listed as tending to show suitability are the existence of

5   realistic plans for the release or the development of marketable skills that can be put to use upon

6   release.  *See* Cal. Code Regs. § 2281(d)(8).  Section 2281(b) allows the Board to consider "any

7   other information which bears on the prisoner's suitability for release."  Cal. Code Regs. §

8   2281(b).

9        Fransway contends that California regulations do not require a firm employment or

10  residence plan in the county of commitment.  (Pet. at 26.)  Rather, he alleges the Board has the

11  discretion to return the inmate to be paroled to another state pursuant to any other law.  Fransway

12  has family in Arizona, who offer their support if he is paroled to that state.  Fransway relies on *In*

13  *re Schoengrath,* 66 Cal. 2d 295, 300-301 (1967), for his proposition that the Board's requirement

14  of post-release plans in the same county was unreasonable.  Petitioner's reliance on *Schoengrath,*

15  however, is misplaced.  First, *Schoengrath* involved a release of a prisoner convicted for second

16  degree burglary to another jurisdiction so that he could stand trial for charges brought against him

17  there.  *Id.* at 298.  Second, the authorities in that case had an express agreement as to what would

18  happen to the prisoner depending on the disposition of his case in the second jurisdiction.  Finally,

19  under California law, the Adult Authority (or the Board in this case), has the power "to impose on

20  any grant of parole 'such conditions as it may deem proper.'"  *Id.* at 300; Cal. Penal Code § 3053.

21       Fransway was convicted of first degree murder and is serving an indeterminate life

22  sentence.  He is not required to appear before any court in the state of Arizona and there are no

23  charges currently pending against him in that state.  He has not presented any facts showing that

24  the state of Arizona has expressly agreed to oversee his release.  Furthermore, the Board in this

25  case has ample discretion to require Fransway to have realistic plans in Los Angeles County.

26  Nowhere in the Penal Code does it say that the Board may not impose this condition upon

27  Petitioner's release.  *See* Cal. Penal Code § 3003; 15 Cal. Code Reg. § 2281.  Although

28  Petitioner's argument that he can be released to another county under California Penal Code

United States District Court

For the Northern District of California

1   Section 3003(b) would be persuasive if he had lived in California prior to his arrest, it is not

2   applicable in this situation.  The statute provides for conditions that may be imposed by the Adult

3   Authority within the state of California.  There is no authority to support the proposition that the

4   statute is likewise applicable where the prisoner seeks to be released to another state, not just

5   another county within California.  Without Arizona's agreement to allow him to be paroled there,

6   California authorities cannot release Fransway to be paroled in that state.  Fransway has not shown

7   any attempt to resolve this issue with Arizona authorities.

8        Fransway possesses sufficiently marketable skills and would probably be able to find

9   employment if released.  Considering Fransway's skills and accessibility to information

10  technology, however, it was not unreasonable for the Board to require some showing of release

11  plans in Los Angeles or at least an attempt to acquire an agreement to be paroled in Arizona.

12  Although this factor would not by itself be sufficient to deny Fransway parole, it may be

13  considered as one part of the overall picture indicating that Fransway was not suitable for parole at

14  the time of the hearing.  *See* 15 Cal. Code Regs. § 2402(b).

15       Accordingly, the Board's determination that Fransway lacked realistic post-release plans

16  in Los Angeles County was supported by some evidence.

17            **b.    The Commitment Offense.**

18       The Board also relied on the nature of the commitment offense as a factor to deny

19  Fransway parole.   The Board found that the offense was a horrific and vicious crime "carried out

20  on an unsuspecting victim who was shot to death in what appears to have been his place of

21  business." (Pet. Ex. B at 71:15-18.)  The Board determined that the offense was committed in an

22  especially cruel manner based on the following factors: (1) it was essentially an execution-style

23  murder (2) it showed a lack of regard for the life and suffering of another.  (*Id.* at 71:22; 72:9-10.)

24  "In order to find that an offense was committed "in an especially heinous, atrocious or cruel

25  manner," there must be some evidence that the "violence and viciousness of the inmate's crime" is

26  greater than that which is "minimally necessary to convict [the defendant] of the offense for which

27  he is confined." *Otte v. Mendoza-Powers*, 2008 U.S. Dist. LEXIS 9130, *13-14 (E.D. Cal. Feb. 7,

28  2008) (internal citations omitted).

1    In the case at hand, Petitioner was convicted of first degree murder.

2    First degree murder is defined as "murder which is perpetrated by any kind of
     willful, deliberate and premeditated killing with express malice aforethought.
3    The word 'willful,' as used in this instruction, means intentional.  The word
     'deliberate' means formed or arrived at or determined upon as a result of careful
4    thought and weighing of considerations for and against the proposed course of
     action. The word 'premeditated' means considered beforehand." (*CALJIC 8.20.*)
5    Malice by itself involves "'an element of viciousness - and extreme indifference
     to the value of human life.'"

6    *Id.* at *14 (internal citations omitted).

7        In *Otte*, the defendant lured his victim to the crime scene, where his two codefendants

8    were lying in wait.  *Id.* at *15.  He then shot an Uzi rifle killing the victim.  *Id.*  The defendant

9    purchased an Uzi rifle and practiced shooting it at a range with the codefendants, with the specific

10   intent of killing the victim.  *Id.* at *16.  The victim was left to die in the bushes with several gun

11   shot wounds.  *Id.*  The defendant in that case clearly acknowledged that he killed the victim in a

12   cruel and atrocious manner.  *Id.*  "The murder was carried out exactly as planned, and the cold

13   blooded execution-style murder of the victim definitely exceeds the minimum elements necessary

14   for a conviction of first degree murder."  *Id.*  (internal citations omitted).

15       Similarly, here, the facts of the offense demonstrate that Fransway intended to kill his

16   victim and had plenty of time to plan the murder.  Fransway does not dispute that he did not know

17   Mr. Giles.  It is also undisputed that he flew to Los Angeles from Denver with the sole purpose of

18   killing Mr. Giles.  After he shot Mr. Giles twice, Fransway left the victim to die in his apartment.

19   Fransway admitted that he was cold and he wanted to show his group of friends that he was what

20   he professed to be – a hit man. (Pet. Ex. B at 17:16-18:14.)  He also admitted that the killing was

21   about nothing and he knew exactly what he was doing.  (*Id.*)  As in *Otte*, the crime was a cold

22   blooded execution-style murder that exceeded the minimum elements necessary for a conviction of

23   first degree murder.  *See Otte,* 2008 U.S. Dist. LEXIS 9130 at *16.

24       Fransway cites cases in which the courts have found that the Board's decision to deny

25   parole was not supported by some evidence because the commitment offense was no longer a

26   predictive factor indicating the prisoner's dangerousness.  All of the cases cited by Fransway,

27   however, are readily distinguishable.  The cases involving prisoners serving time for second

28

17

degree murder are inapposite because the facts and circumstances required to convict someone of first degree murder are significantly different. *People v. Caylor*, 259 Cal. App. 2d 191, 203 (1968) ("The difference between first and second degree murder is basically one of the quantum of the personal turpitude of the offender; however, this quantum is measured by the character of the particular homicide involved.")

The cases cited by Petitioner involving prisoners serving time for first degree murder are likewise distinguishable. First, unlike the circumstances in Fransway's case, *Clay v. Kane*, 2006 U.S. Dist. LEXIS 55993, *3 (C.D. Cal. Jan. 20, 2006), involved a set of circumstances under which it was not clear who caused the death of the victim. Clay was one of the four perpetrators involved in a savage beating of the victim. *Id.* The victim was robbed and then beaten to death. *Id.* His body was placed in a trunk of a car that was later abandoned. *Id.* The body was discovered a couple of weeks later because of the strong odor permeating the air. *Id.* Fransway does not dispute that he flew to Los Angeles with the sole intention of killing Mr. Giles and that it was he who carried out the murder on his own.

*Willis v. Kane*, 485 F. Supp. 2d 1126 (N.D. Cal. 2007), was reversed in an unpublished opinion by the Ninth Circuit holding that there was sufficient evidence to support the Board's denial. *Willis v. Kane*, 2007 U.S. App. LEXIS 27065 (9th Cir. 2007). *In re Lawrence*, 150 Cal. App. 4th 1511 (2007), is currently on appeal and involves a completely different set of circumstances. In *Lawrence*, the petitioner killed her lover's wife after the lover informed her that he will not leave the wife to be with her. *Id.* at 1518-19. The court in that case found that Lawrence was going through severe stress in her life and committed the offense out of rage and anger. *Id.* Although Lawrence initially fled, she decided to turn herself in after 11 years. *Id.* at 1519. Unlike the facts in Fransway's case, the facts in *Lawrence* were no more than what was necessary to find the defendant guilty of murder in the first degree.

Finally in *In re Barker*, 151 Cal. App. 4th 346, 355 (2007), the petitioner was seventeen years old at the time of the offense. His mentor at the time, informed Barker that he had been abused by his father and that his mother and grandfather have been silent witnesses to the abuse. *Id*. at 352-54. The mentor asked Barker to help him kill his parents and grandfather and Barker

1   obliged. The two murdered the unsuspecting parents and grandfather and then tried to conceal the

2   crime by staging a burglary. *Id.* Fransway was not a young kid who succumbed to the persuasion

3   of his mentor. He murdered his victim with full knowledge and understanding of what he was

4   doing as he, himself, admitted.

5        Based on these circumstances, there was some evidence to support the Board's finding

6   that the murder was carried out in an especially cruel manner.

7                     **c.**      **Fransway's Need for Self-Help and Therapy.**

8        After considering all the evidence before it, the Board determined that Fransway

9   required continued self-help and therapy. The Board provided no basis for this determination.

10  The only reason the Board provided was: "that he's not sufficiently participated in self-help

11  programming, and again, we go back to the parole plans." (Pet. Ex. B at 72:12-15.) Furthermore,

12  the record does not reflect any suggestion that Fransway had not sufficiently participated in self

13  help programming or that he required further self-help or therapy. Conversely, the only

14  psychological evaluation considered by the Board was Dr. Macomber's report, which the Board

15  itself admitted supported release. In addition, it appears from the record that Fransway had

16  participated in practically every program available to him in prison. Further, Dr. Macomber

17  concluded that Fransway did not require any additional counseling and that he did not pose a

18  danger to society if released. (Pet. Ex. B at 46-47.)

19       Although it is not this Court's task to reweigh the evidence, the Court concludes that the

20  record does not support a finding that Fransway's need for self-help or therapy independently

21  demonstrates that he would pose an unreasonable risk of danger to society if released. *See*

22  *Hayward*, 512 F.3d at 548 ("The Superior Court's determination that Hayward's psychological

23  and counselor reports were "somewhat unfavorable" was an unreasonable interpretation of those

24  reports, and the Superior Court's conclusion that the reports provided some evidence to support the

25  Governor's determination that Hayward was not suitable for parole was an unreasonable

26  application of the some evidence standard articulated in *Hill*."). Accordingly, this Court finds that

27  the Board's determination that Fransway required continued self-help and therapy was not

28  supported by some evidence.

### d.   Fransway's Previous Convictions.

The Board found that although Fransway did not have a juvenile record, he had a somewhat lengthy adult criminal history.  (Answer, Ex. B (Life Prisoner Evaluation Report ("LPER")) at 3.)  Section 2402(c)(2) states that if a "prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim," that factor would tend to show unsuitability for parole.

The evaluation revealed that Fransway had a number of criminal convictions on his record.  Fransway was arrested on charges of auto theft on March 22, 1968.  (Answer, Ex. B (LPER at 3).)  He was convicted of auto theft on October 28, 1968 and sentenced to three years probation.  He was convicted on a charge of forgery on February 16, 1970 and sentenced to two years probation.  Fransway was convicted on charges of not-sufficient-funds ("NSF") checks and theft on February 23, 1972 and sentenced to six months in the Wisconsin House of Corrections.  He was then convicted on charges of NSF checks and fined $50.00 plus costs.  On March 15, 1972, Fransway was convicted on charges of driving with a suspended license and sentenced to six months.  He also received sentences of three years on each of two counts of theft and one count of forgery.  Finally, Fransway was convicted on March 1, 1978 on a charge of taking a vehicle for temporary use/joyriding and sentenced to one year summary probation and 34 days in jail.  (*Id.*)

Fransway's prior convictions do not lead to the conclusion that he has a history of inflicting or attempting to inflict serious injury on a victim as required by Section 2402(c)(2).  None of the crimes that Fransway was either arrested or convicted for involved the use of violence or attempting to inflict serious injury on a victim.  Accordingly the Board's determination that this factor tends to show that Fransway poses an unreasonable danger to society is not supported by some evidence.

### e.   Fransway's Institutional Behavior.

After considering Fransway's disciplinary record while incarcerated, the Board determined that his record supported the denial of parole.  The institutional behavior factor of section 2402 specifically requires that institutional misconduct be serious.  15 Cal. Code Regs. § 2402(c)(6).  Fransway received two CDC 128A's (counseling chronos).  (Pet. Ex. H.)  The first

United States District Court

For the Northern District of California

1   one was in 1992 for excessive hobby supplies and the second in 1998 for unexcused absence.  (*Id.*)

2   He also received three CDC 115's - two serious rules violations for possession of

3   marijuana/hashish in 1980 and 1981 and one administrative infraction for possession of a tattoo

4   gun in 1979.  (*Id.*)  Otherwise, at the time of the hearing, Fransway remained disciplinary free for

5   over 23 years.

6          However, considering that Fransway has had two serious violations while in prison, the

7   Court finds that the Board's determination that this factor tends to show that Fransway poses an

8   unreasonable danger to society was supported by some evidence.

9          Although the Board may have erred in finding that Fransway's continued need for therapy

10  or his previous record of violence were factors demonstrating some evidence that he would pose

11  an unreasonable danger to society, there was sufficient evidence to support the other section 2402

12  factors.  It is not this Court's province independently to assess the credibility of witnesses or to

13  weigh the evidence presented to the Board.  *Hill*, 472 U.S. at 455; *Sass*, 461 F.3d at 1128.

14  Accordingly, the California Court of Appeal's rejection of Fransway's claims did not result in a

15  decision that was contrary to or involve an unreasonable application of clearly established federal

16  law, nor was it based on an unreasonable determination of the facts in light of the record.  28

17  U.S.C. § 2254(d)(1),(2).

18  **E.        The Concerns Articulated in *Biggs v. Terhune* Are Not Implicated In this Case.**

19         In *Biggs*, the Ninth Circuit stated that,

20         [o]ver time, ... , should Biggs continue to demonstrate exemplary behavior
           and evidence of rehabilitation, denying him a parole date simply because of
21         the nature of his offense would raise serious questions involving his liberty
           interest. ...
22
           A continued reliance in the future on an unchanging factor, the circumstance
23         of the offense and conduct prior to imprisonment, runs contrary to the
           rehabilitative goals espoused by the prison system and could result in a due
24         process violation.

25  *Id.* at 916-17; *cf. Dannenberg*, 34 Cal. 4th at 1094 ("sole reliance on the commitment offense

26  might, in particular cases, violate" section 3041(a)'s "provision that a parole date 'shall normally

27  be set' under 'uniform term principles, and might thus also contravene the inmate's

28  constitutionally protected expectation of parole"); *Rosenkrantz*, 29 Cal. 4th at 682-83 ("[t]he

21

United States District Court

For the Northern District of California

nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").

In issuing the note of caution in *Biggs* regarding continued reliance on unchanging factors, the Ninth Circuit gave little guidance to district courts as to how they should evaluate such a claim. In *Irons,* however, the court noted that when it had determined that "a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comport[ed] with due process, the decision was made before the inmate had served the minimum number of years required by his sentence." *Id.* The court concluded that "[a]ll we held in [*Biggs* and *Sass,*] and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms." *Id.* at 853-54. The *Irons* court further "expressed its hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes." *Id.* at 854.

The lessons this Court draws from *Biggs*, *Sass*, *Irons, Dannenberg, Rosencrantz*, and various district court opinions that have applied the principles articulated therein,[2] are as follows: (1) that the Board may properly consider the nature of the commitment offense to determine whether or not a prisoner is suitable for parole; (2) that in certain instances the nature of the

---

[2] *See, e.g., McCullough v. Kane*, 2007 WL 1593227 at *6, 9 (N.D. Cal. June 1, 2007) (finding due process violation in Governor's reversal of the Board's decision to grant parole after petitioner had served twenty-one years of fifteen years to life sentence for second degree murder and met circumstances tending to indicate suitability for parole); *Brown v. Kane*, 2007 WL 1288448 at *1 (N.D. Cal. May 2, 2007) (finding due process violation in Governor's reversal of the Board's decision to grant parole at tenth parole suitability hearing after petitioner had served twenty-four years of fifteen years to life sentence for second degree murder and met circumstances tending to indicate suitability for parole); *Pirtle v. Cal. Bd. of Prison*, 2007 WL 1140817 at *3 (E.D. Cal. Apr. 17, 2007) (finding due process violation in Board's denial of parole based on petitioner's commitment offense, criminal record, unstable social history, failure to upgrade vocationally, and need for further therapy to cope with stress), *report and recommendation adopted* 2007 WL 15446620 (E.D. Cal. May 29, 2007); *Thomas v. Brown*, 513 F. Supp. 1124 (N.D. Cal. 2006) (finding due process violation in Governor's reversal based on petitioner's commitment offense, his failure to accept responsibility, his need for further therapy, and his criminal history).

1  offense alone may support a finding that the prisoner is unsuitable for parole; and (3) at some

2  unspecified point, the nature of the offense will no longer be of sufficient predictive value in

3  determining whether or not a prisoner poses too great a risk of danger to be considered suitable for

4  parole.

5      Fransway argues that the Board has simply transformed his sentence from seven years to

6  life with a possibility of parole into life-without-possibility-of-parole because it is relying on

7  unchanging factors such as his commitment offense to deny him parole for the seventeenth time.

8  However, the Board did not rely exclusively on the commitment offense or other unchanging

9  factors to deny Fransway parole.  The Board relied more heavily on the fact that Fransway had not

10  secured post-release plans in Los Angeles County.  Further, Fransway was unable to demonstrate

11  how he attempted to secure a place to live in Los Angeles upon his release.  Although Fransway

12  demonstrated plans for release in Arizona, there is no indication that Arizona had agreed to allow

13  him to be paroled in that state.  Because the Board did not rely exclusively on unchanging factors

14  to deny Fransway parole, the concerns articulated in *Biggs* are not implicated in this case.

15  **F.      There is No Evidence To Support the Allegation that the Board Operates Under a No-Parole Policy.**

16      Petitioner alleges that "the Board has a 'no parole policy' which is evident by the

17  machinations of pro forma hearings and predetermined results, with token grants of parole to

18  masquerade as giving individualized consideration as due process requires."  (Pet. at 28.)  To

19  support his argument, Fransway relies on court decisions that found this policy in individual cases

20  decided during Governor Davis's administration.  He further contends that this "no parole policy"

21  has carried over into Governor Schwarzenegger's administration.  However, other than a few

22  vague statistical references regarding parole release rates for murderers in California and some

23  articles regarding Governor Schwarzenegger's track record with regard to parole grants, Fransway

24  fails to provide any evidence to support this allegation.  Conversely, the statistics demonstrate that

25  Governor Schwarzenegger has actually permitted a number of convicted first degree murderers to

26  be released on parole during his administration.

27      Furthermore, Fransway failed to show that he did not receive individualized consideration

28  at his parole hearing.  *See Coleman v. Board of Prison Terms,*  2004 U.S. Dist. LEXIS 29929, *11-

**United States District Court**
For the Northern District of California

12 (E.D. Cal. Dec. 21, 2004).  Fransway also failed to show that the Board was not neutral in its decision making process.  *See id.*  In fact, the Board repeatedly informed Fransway that he must attempt to secure a residence in Los Angeles in order to be eligible for a release date.  For whatever reason, Fransway has not done so.

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  A separate judgment shall issue, and the Clerk shall close the file.

**IT IS SO ORDERED.**

Dated: May 6, 2008

_____
JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE